| iLANDRIEU, Judge.
This is an appeal by Skate Country, Inc., Chef Menteur Skate Center, Inc., and the Louisiana Insurance Guaranty Association (LIGA) of a trial court judgment, following a *289 jury verdict, in favor of Patti Pate for injuries she sustained when she fell and broke her hip at Skate Country Roller Rink on June 30,1989. The judgment in Pate’s favor was for $200,000.00, subject to a credit of $100,000.00 for 50% comparative fault apportioned to Pate, plus costs and interest from the date of judicial demand.
At the time she was injured, Pate was a summer camp counselor for the Archdiocese of New Orleans’s Witness program. She and the other counselors had taken the campers, ages 5-12, on a field trip to the roller rink. At the rink, Pate skated across the floor to supervise and/or reprimand some of the older children who were opening the emergency exit door. As she proceeded across the rink, Pate saw an apparently frightened young girl, who was among Pate’s group of campers, on the ground and unable to get up because of others skating around her. After confronting the children near the exit, Pate saw the young girl still on the floor. Having seen no rink employees or “floorguards”, Pate approached the|2girl to help, but as she did so, the girl reached out her hand on the floor. Pate swerved to miss skating over the girl’s hand, and consequently, she slid into the concrete wall just past the fallen camper and broke her hip.
Pate was brought to Pendelton Methodist Hospital by ambulance, where she underwent hip reduction surgery. The surgeon placed a metal plate and screws inside her hip to aid in healing. Two years later, the surgeon removed the screws but was unable to remove the metal plate. Pate has a long scar on her leg and residual pain and discomfort.
At trial, Pate presented the testimony of Coach Samuel Holden, another counselor at the skating rink who said that it was his understanding that there would be rink employees available to assist skaters, yet he was with Pate after her fall for ten or fifteen minutes before someone from the rink came to their aid. He did not see Pate fall or see the camper who had fallen. The only rink employees he had seen earlier were playing video games. Holden testified that Pate now is not the same person she was before the accident.
Pate, who had been a teacher in the Orleans parish school system for 17 years at the time of trial, was 36 years old at the time of this accident. She could skate and had skated before, but she said she was not an expert skater.
Pate testified that after she heard an announcement warning some of the campers about opening the exit door, she decided to check on the situation. She then saw the little girl who was trying to get up, but did not approach her until after she had confronted the children near the exit, satisfying herself that they were not deliberately opening the door. After doing do, Pate then ushered her young son, who had apparently entered the rink to meet her, off of the rink. At this point, Pate testified, she saw the girl still on the floor, crawling and trying to get up. Older children were apparently pushing her away. Pate said that when she | -¡did rush to help the girl, five to ten minutes had passed from the time she had first seen the girl, and she had not seen any floorguards.
Pate testified that she is in constant pain and that her surgery was very hard on her emotionally because while she was in the hospital for ten days, she was separated from her baby who was at home at the time. She said that her scar is a constant reminder of the accident and that she is unable to walk as much as she did before the accident. Although she returned to work approximately three months after her injury, she believes she does not perform her job as well as she did before the accident.
Dr. Kenneth Adatto, an orthopedic surgeon, evaluated Pate once in 1995. He found abnormality and loss of motion in her hip. He attributed her continued limping and back pain to the 1989 injury at the skating rink. Dr. Adatto believed that Pate’s injury probably would not affect her job as a teacher, and he had no recommendations for future surgery. He would expect her to feel changes in the weather, experience back pain and have aching the rest of her life. He believed that Pate was honest about her complaints, all of which he found to be expected.
Dr. Alain Craeco was Pate’s treating physician. He said that Pate suffered a fracture of the femur, and he operated on her to *290 stabilize and reduce the fracture. Two years later, he operated to remove the hardware he had placed inside her hip but was unable to remove the plate because of its position. He believes that the weakness in her muscle, causing a slight limp, should correct itself in time. One and a half years before trial, Dr. Cracco found full range of motion in her hip. He assessed a 10% permanent residual impairment to her whole body, but he would not argue with Dr. Adatto’s 25% figure.
Although Dr. Cracco anticipates no future surgery for Pate, he said that the problem with the metal plate staying in her body is that there is an increased riskjjof infection. Dr. Cracco always found Pate to be honest, and he believed that she went back to work faster than most people. For future medical expenses, Dr. Cracco feels that Pate will require one doctor visit each year.
Donald Maginnis, an architect, twice visited the roller rink where Pate was injured. He found that the wall around the rink was made of 8 inch concrete block or cinder block. The wall had a 6 inch high baseboard encircling the rink which was made of one-half inch plywood covered with carpeting. The 1981 Roller Skating Rink Safety Standards[1] were introduced into evidence, and Maginnis testified that it appeared to him that the rink he visited utilized some of the safety standards. He believed, however, that six foot high carpeting or other padding on the walls would have presented less of a risk of injury than the solid concrete block wall which existed.
In this appeal, defendants first assign error to the jury’s finding that the lack of rink employees on the skating rink floor was a cause-in-fact of Pate’s injury.
It is well settled that the operator of an amusement facility is not an insurer of the safety of the patrons but is liable for injuries sustained by them only if the operator is guilty of negligence. A participant in a sport assumes the ordinary risks attendant upon such participation. Heard v. Bonnie and Clyde’s of Hattiesburg, Inc., 501 So.2d 1003 (La.App. 2nd Cir.), writ denied, 503 So.2d 481 (La.1987); Dobard v. Skate Country, Inc., 451 So.2d 1231 (La.App. 4th Cir. 1984).
The defendants argue that the number of floor guards working at the time of the accident is inconsequential because the accident happened so quickly and Igwith no forewarning that a floorguard could not have prevented it. This argument, however, misses the point because it was Pate’s position that if a floorguard had assisted the young camper who was having trouble, Pate would not have had to go to her aid.
The record does not indicate how many, if any, floorguards were in the rink around the time of Pate’s injury. From Pate’s and Coach Holden’s testimony, particularly that the child was on the floor unassisted for several minutes and that it took ten to fifteen minutes for a rink employee to come to Pate’s aid once she was obviously injured, it is reasonable to conclude that there were no floorguards in the rink at least for a substantial amount of time. Significantly, the defendants presented no evidence on the issue of floorguards.
The roller skating association’s safety standards specifically outline standards for floor supervisors and provides in part:
A. There will be floorguards on duty whenever the rink is open for sessions.
B. One floorguard shall be on duty for approximately every 200 skaters.[2]
C. Floorguards must be identifiable by their attire.
D. The floorguard’s duty is to direct and supervise skaters.
1. The conduct of skaters will be under floorguard’s supervision.
2. When working alone, floorguards will not skate special events with a partner. He or she must be available to assist skaters at all times. Relief of *291 floorguards will be provided by management.
3. When two floorguards are working, one must be available to assist skaters and supervise the floor.
4. Additional skating supervision may be provided by personnel observing the premises on or off skates.
* * * ⅜ ⅜ ⅜
7. When a skater falls, if it is necessary, assist the skater off the floor via the nearest exit. If possibility of serious injury exists, CALL MANAGER FOR ASSISTANCE.
|6Considering that a patron at a skating rink assumes only the ordinary risks of a recreational activity, she may reasonably conclude that the danger presented by a seared child who has fallen and is having trouble getting up is within the control of floorguards who have a duty, according to the safety standards, to prevent a child from remaining on the rink floor for any length of time. That Pate took it upon herself to accomplish the job of a floorguard, we believe, is adequately measured by the jury’s assessment of 50% comparative fault on her.
The jury found, from a preponderance of the evidence, that Skate Country Inc. was negligent and that their negligence was a cause-in-faet of Pate’s injuries. Whether a particular action is the cause-in-fact of a particular harm is a factual question. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). The jury could have found that but for the absence of a floorguard to assist the fallen skater, Pate would not have gone to her and been injured. The jury’s factual determination that the defendants’ act or failure to act was a cause-in-fact of Pate’s injury was not incorrect. Absent a showing that the trial court’s factual determination was clearly wrong, we must affirm that finding. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), on remand 370 So.2d 1262 (La.App. 3rd Cir.), writ denied 374 So.2d 660 (La.1979). Hence, we find no merit in the defendant’s first assignment of error.
Determination of the defendants’ legal responsibility, however, does not end after finding causation; we must also determine whether, as a legal question, there was a duty owed to Pate by defendants which protected against the risk involved.
This court has found that the duty owed by a skating rink to its patrons is to keep the skating floor in a reasonably safe condition. Perron v. Ambassador Ins. Co., 541 So.2d 261 (La.App. 4th Cir.), writ denied, 543 So.2d 5 (La.1989). Considering the industry safety standards outlined above, this duty, we believe, includes an obligation for the floorguards to notice a fallen skater who has been on the floor for several minutes and to help her off the rink, not only to prevent injury to her, but also to prevent injury to other skaters who could easily run into her.
In determining whether defendants breached their duty, we must consider that defendants provided absolutely no evidence on the actions, the duties, or even the existence, of floorguards at the rink when Pate was injured. By allowing the young skater to remain on the floor for a significant amount of time, defendants breached then-duty to Pate, a patron of the skating rink.
The defendants’ second assignment of error is directed at the jury finding a causal relationship between the condition of the skating rink walls and Pate’s injury; particularly, whether having padded or carpeted walls would have prevented or lessened her injury. The record does not reveal precisely how Pate hit the wall. Pate indicated that her foot hit the baseboard. Her treating physician, Dr. Craceo, described the accident as her foot impacting the wall and twisting as her body went in another direction. The twisting caused a “shearing” effect on her bone, as distinguished from a “crushing” effect. In this situation, Dr. Cracco opined, padding on the wall would have made no difference.
Conversely, Dr. Adatto and Mr. Maginnis believed that from a logical standpoint any padding on a wall would present less of a risk of injury than a solid concrete block wall. The roller skating rink safety standards are neutral on the issue. In discussing the use of carpeting in rinks, the standards report that “[s]ome rinks continue to use rubber or foam-backed carpeting for wall installation or *292 for railings as they feel this affords greater cushioning protection.”
Overall, the evidence presented on the issue of padding on the rink walls | «would not have been sufficient to impose liability on the defendants. Nevertheless, we do not know what the jury decided was the negligent conduct that was the cause-in-fact of Pate’s injury. Having determined that the jury’s verdict was not clearly wrong because the evidence concerning the lack of floor-guards was sufficient to explain the defendants’ negligence, the insufficiency of the evidence about padding on the walls is of no moment.
In their third assignment of error, the defendants claim that the trial court erred by instructing the jury on strict liability. The defendants, however, did not object to the trial judge’s instructions to the jury, which included discussion of strict liability as well as negligence. La.Code Civ. Proe. Ann. art. 1793(C) (West 1990) provides:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
Since the defendants did not object to the instructions, we will not review the issue on appeal. Ronquillo v. Belle Chase Marine Transportation, Inc., 629 So.2d 1359 (La.App. 4th Cir.1993).
In their last assignment of error, the defendants claim that the trial court erred by awarding Pate interest and court costs for the time prior to the insolvency of Universal Security Insurance Company. We agree.
Pate was injured on June 30, 1989 and filed suit against Skate Country, Inc. and its insurer, Universal Security Insurance Company, on June 26, 1990. Universal was declared insolvent in October 1991. LIGA became the statutory successor to Universal shortly afterwards.
Effective September 7, 1990, the legislature enacted La.Rev.Stat. Ann. § 1922:1379(3)(d), which exempted LIGA from the payment of claims based on or arising from a pre-insolvency obligation of an insolvent insurer, including court costs and interest. In Prejean v. Dixie Lloyds Ins. Co., 94-2979 (La.9/15/95), 660 So.2d 836, 837, the Court held that LIGA’s obligation to pay court costs is governed by the law in effect on the date the insurer is declared insolvent, not by the law in effect on the date of the event giving rise to the insurer’s liability. Hence, La.Rev.Stat. § 22:1379(3)(d) applied prospectively to exempt LIGA from liability for pre-insolvency court costs incurred by its predecessor. Id.
Likewise, in this ease LIGA is not responsible for court costs and judicial interest prior to Universal’s insolvency. The judgment on appeal is amended to limit LIGA’s responsibility for interest and court costs to that incurred after Universal’s insolvency.
Accordingly, the trial court judgment in favor of Pate is amended and affirmed as amended. All costs of this appeal are assessed to the defendants.
AMENDED, AND AS AMENDED, AFFIRMED.

. The standards were compiled by the Roller Skating Rink Organization of America (RSROA) Risk Management Committee, adopted February 7, 1980, and amended May 2, 1981, as an industry standard by vote of the RSROA Board.

. It appears from the record that there were less than 200 skaters on the rink at the time of Pate’s accident.