LKNOLL, Judge.
This is a personal injury lawsuit brought by Stephen Lejeune, an Acadian Ambulance driver, against Union Pacific Railroad (Union Pacific) for damages resulting from an ambulance-train collision at a rural crossing. Commercial Union intervened in the suit as the worker’s compensation insurer of Acadi-an Ambulance. The jury found in favor of Union Pacific.
Lejeune and Commercial Union appeal, contending: (1) the jury was manifestly erroneous in failing to find Union Pacific liable for damages; (2) the trial judge erred in excluding a portion of a video that Lejeune and Commercial Union offered into evidence; and, (3) the trial judge erred in failing to grant a motion for new trial based on jury misconduct. We reverse and render.
RFACTS
On November 28, 1988, Lejeune and Patrick Landry, employees of Acadian Ambulance, were en route to a very serious accident between an eighteen-wheeler and an automobile, where a mother was killed and three young children were seriously injured. The mother’s surviving husband fortuitously happened upon the accident and began having chest pains. Lejeune was driving the ambulance west on Louisiana Highway 365 (La.365), a rural, two-lane road north of Crowley, Louisiana. The ambulance was traveling at approximately 65 to 70 miles per hour with its red lights flashing; the siren was turned to the on position, but the sound was not activated. Not far behind the ambulance was a state police automobile driven by Trooper James Simon who was proceeding to the same accident Lejeune and Landry had been directed.
At the same time, a Union Pacific locomotive, running long-end forward and pulling two hopper cars, was proceeding north at approximately 24 — 25 miles per hour en route from Crowley to Eunice, Louisiana. In railroad nomenclature, running long-end forward means that although the locomotive was leading the train, the cab of the locomotive (where the crew was situated) was to the rear of the locomotive, instead of the front. As a result of this configuration, the engineer, Jack Buckner, was seated on the west side of the locomotive and had no view to the east of the train. The ambulance was ap *806 proaching the railroad crossing from the east. Thus, Buckner never saw the ambulance.
With Buckner in the cab were the conductor, Halbert Hardy, and the brakeman, John Garret; both of these men were seated with their backs toward the front of the train and were unable to see anything outside the cab. Also in the cab were the fireman, Ernest Mitchell, and another brakeman, James Mayo. Mitchell was seated ^facing forward in the right front seat; his location allowed him to see ahead, but not to the east. Mayo was seated several feet behind Mitchell; his line of sight allowed him to see vehicles approaching from the east on La. 365.
Buckner testified that normally a whistle board, a small, white metal sign with an “X” painted on it, is erected a quarter mile (1,320 feet or 440 yards) from every crossing. The whistle board alerts the engineer that there is a crossing ahead and that he should begin blowing his horn to warn that a train is coming. Although the whistle board had been reported missing from the crossing, the sign had not been replaced at the time of the accident. In its stead, Buckner testified that he used a small trestle, located 1,775 feet from the crossing, as a landmark to remind him of the upcoming crossing and his need to sound the horn. Buckner testified that he began sounding the horn at the trestle on the day of the accident, and that he continued blowing it until he reached the crossing. This is disputed. The testimony of persons in the vicinity of the crossing differed on whether they heard a train horn. In addition, those persons in the area who did hear the horn had differing recollections of the length of time that the horn blew.
Lejeune testified that as the ambulance proceeded west on La. 365 his vision was significantly impaired by the glare of the setting sun. He further stated that he did not see the train and that he never heard the train horn blow. Trooper Simon, who was following Lejeune a short distance behind, mirrored Lejeune’s testimony.
As Lejeune entered the crossing where La. 365 intersects the Crowley-Eunice branch of the Missouri Pacifie/Union Pacific Railroad line, the ambulance struck the side of the Union Pacific engine. The ambulance, which left 131 feet of skid marks in an attempt to stop, was totally destroyed. Lejeune and Landry were both critically Linjured, and were pinned in the vehicle. Emergency personnel had to cutoff the roof of the ambulance to extricate Lejeune and Landry.
Lejeune and Landry filed separate damage suits against Union Pacific. Landry’s suit was settled prior to trial.[1] Lejeune’s case and the worker’s compensation intervention of Commercial Union proceeded to trial. In a ten to two verdict,[2] the jury found in favor of Union Pacific. In accordance with the jury verdict, the trial judge dismissed Le-jeune’s lawsuit and the intervention of Commercial Union. Post-verdict motions for judgment notwithstanding the verdict and new trial filed by Lejeune and Commercial Union were denied.
JURY MISCONDUCT
Lejeune and Commercial Union contend that the trial court erred in failing to grant their motion for new trial on the basis of jury misconduct. They argue two instances of misconduct.
In their first contention, Lejeune and Commercial Union point to a situation stemming from the train engineer’s testimony about his seminary experience. During trial a juror engaged the train engineer in a discussion about his time as a seminary student.
Contact between a juror and an interested party is not sufficient to require the gravity of a motion for new trial. Searle v. Travelers Ins. Co., 557 So.2d 321 (La.App. 4 Cir.1990). A new trial is mandated only on a showing that the juror’s conduct was of such a grievous nature as to preclude the impartial administration of justice. Gormley v. Grand Lodge of La., 503 So.2d 181 (La.App. 4 Cir.), writ denied, 506 So.2d 1227 (La.1987). *807 Furthermore, it is well settled that affidavits and other |stestimony by jurors cannot be used as evidence to impeach their verdict. La.Code Evid. art. 606; Uriegas v. Gainsco, 94-1400 (La.App. 3 Cir. 9/13/95); 663 So.2d 162; writ denied, 95-2485 (La.12/15/95); 664 So.2d 458.
In the case sub judice, Union Pacific filed a written motion to strike[3] the juror’s affidavit that was submitted by Lejeune and Commercial Union in support of their post-verdict motion for new trial. This affidavit was clearly inadmissible and could not be relied upon to support this assignment of error. Id. Moreover, when the jury was polled, the juror/affiant indicated that he voted in favor of Lejeune. Thus, it is evident that the contact between the engineer and the juror did not adversely affect Lejeune and Commercial Union.
The second instance of jury misconduct was brought to the attention of the trial judge during the course of trial. In this instance, a copy of a letter to the editor written in a local newspaper was found in the jury room prior to deliberation. The article addressed excessive jury verdicts in general and related the frustrations of a prospective juror (in a trial other than the ease sub judice) with regard to the process of jury selection. After discussing this discovery with the trial attorneys, the trial judge addressed the jury and requested that any juror who felt influenced by the letter to signify by raising their hands. No juror did so. In connection with his discussion with the jury, the trial judge further instructed the jurors to disregard the letter and to remember their oath not to be swayed by outside influences.
After carefully considering the record of this latter allegation of jury misconduct, we find that Lejeune and Commercial Union failed to prove that the level of behavior was of such a grievous nature as to preclude the impartial administration h,of justice. Moreover, after the trial judge questioned the jury and further instructed them, the record shows that neither Lejeune nor Commercial Union objected to the trial judge’s resolution of this issue.
LIABILITY: MANIFEST ERROR
Lejeune and Commercial Union contend that the jury was manifestly erroneous in failing to find Union Pacific liable for damages. Their argument of jury error is twofold: (1) the jury was manifestly erroneous in failing to find that the train crew did not blow the horn in a proper and timely manner; and (2) in failing to find that the train crew’s inattention caused them to take inadequate measures to avoid the accident, namely in failing to timely apply the train brakes.
The appellate jurisdiction of a court of appeal extends to both the law and the facts. La. Const, art. V, § 10(B). However, the exercise of this jurisdiction is tempered by the jurisprudential rule that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. Furthermore, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Stobart v. State, 617 So.2d 880 (La.1993).
Credibility determinations are subject to the strictest deference and the manifest error-elearly wrong standard demands great deference for the trier of fact’s findings. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Canter v. Koehring Company, 283 So.2d 716 (La.1973). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong but whether the fact finder’s conclusion was a reasonable one. Stobart, 617 So.2d 880. The reviewing court may not disturb reasonable evaluations of credibility Land reasonable inferences of fact when viewed in light of the record in its entirety even though it feels its evaluations are more reasonable. Id.
*808 We have carefully reviewed the testimony regarding the blowing of the train’s horn. There is persuasive evidence and testimony in the record to support Lejeune’s position that the tram’s whistle was not blowing when it should have, which would have alerted approaching traffic at the crossing that a train was coming. The train is supposed to blow its whistle 440 yards or one-quarter of a mile before a crossing (La. R.S.32:168). The whistle board had been missing for a while before this accident and for some inexplicable reasons it was not replaced. The engineer, Buckner, used a small trestle 1,775 feet from the crossing to commence blowing the whistle. This distance is 455 feet farther from the crossing than the required whistle board should have been and 875 feet farther than the 900 feet required by law. The effect is the train blew its whistle too soon, and as it approached the crossing the whistle blowing was over. Lejeune shows that the train was traveling 36.7 feet per second. At its speed it would take 48.4 seconds for it to reach the crossing from the trestle. It took approximately 15 — 20 seconds for the engineer to blow a sequence of 2 longs, a short and a long. So, for approximately 28 — 33 seconds before the crossing, the train was running silent. Apparently the jury rejected this evidence and the testimonies of Lejeune, the State trooper and other witnesses in the area who testified that the train was not blowing its whistle at the crossing. The jury must have accepted the testimonies of the train crew and other witnesses in the area that the train was blowing its whistle at the crossing.
There are two opposing views on this issue and while we find the plaintiffs version reasonably supported by the record, we cannot say the jury was manifestly erroneous. Rosell, 549 So.2d 840.
|8We next consider the contention of Lejeune and Commercial Union that the jury erred in its failure to find that the train crew was negligent for not reacting timely to the ambulance’s approach from the east. They emphasize that there is no conflict in the testimony that the two crew members on the eastern side of the cab observed the speeding ambulance with its lights flashing about 700 to 800 feet before the crossing. They likewise point out that the actions taken by the train crew in response to the ambulance’s approach is also undisputed.
It is well settled that the train crew can assume drivers will bring their vehicles to a stop unless the vehicle’s approach is so unusual as to place an ordinarily prudent man on notice the vehicle cannot be brought to a stop in time to avoid a collision. Edwards v. Missouri Pacific, 291 So.2d 483 (La.App. 3 Cir.1974). Lejeune and Commercial Union assert that the facts of the present case exemplify the unusual vehicle approach that should have caused the train crew to heighten their vigilance and to initiate accident avoidance procedures more timely. We agree.
Mayo testified that he saw the ambulance on La. 365, approaching at a high rate of speed and with its emergency lights flashing. He further said that although he verbalized this situation to the crew in the cab, he realized that the engineer, Buckner, did not hear him. Mayo then yelled at the conductor, Hardy, to get the attention of Buckner. Hardy responded by tapping Buckner on the leg and pointing to Mayo. At this juncture, Buckner said that although he observed Mayo giving him an “easy signal,” i.e., a hand gesture used among railroaders to signal the need to slow the train down, he did not know why he was asked to slow the train. In response, Buckner only applied the brakes gently. As this was going on, Mitchell testified that he leaned back, looked through the window on the right side of the locomotive, and saw the ambulance with its flashing red lights as it crossed the small bridge east of the | ¡¡crossing. Later it was determined that the bridge was 779 feet east of the crossing. It was not until Mayo and Mitchell jumped up just before the collision that Buckner engaged the emergency brakes; at this point the train was approximately 172 feet from the crossing. The train did not stop for another 300 feet past the crossing.
Mayo testified that when he first saw the ambulance, he thought that the ambulance would stop. Although he could not cite any physical evidence to support his thinking, he believed that the ambulance would stop be *809 cause he was trained to assume that all approaching traffic would stop. See La.R.S. 32:171(A).
Gary Wolf, an expert in the field of train operations, train dynamics, and accident reconstruction, testified on behalf of Union Pacific. He testified that his review of the recording data onboard the train indicated that the train was traveling at approximately 24 m.p.h., well within the speed limit set for this portion of the track. His review also showed that Buckner applied the brakes, first a service application (approximately 6 pounds of pressure) followed by a full emergency brake application approximately 4 or 5 seconds later.
Wolf described the interior of the train cab as being a noisy environment. Because of the inability to communicate around loud equipment, railroaders use hand signals. Thus, he said that it was normal for Mayo to give Buckner the “easy signal” to slow down.
Wolf also testified that if the railroad crew had applied the emergency braking system at least 300 feet prior to the point of the collision, the train would have delayed reaching the crossing by at least eight-tenths of a second. Wolf stated that such a time delay would have been sufficient to permit the ambulance to clear the crossing.
| ^Nevertheless, Wolf opined that the train crew in the case sub judice reacted reasonably to the approaching ambulance. The crew observed the ambulance at 800 to 900 feet, a distance within which the ambulance could have stopped. Likewise, knowing that the train has the right of way, even over emergency vehicles, Mayo and Mitchell were reasonable in their perception also that the ambulance could have reached the crossing before the train.
John Bentley testified for Lejeune and Commercial Union as an expert in motor vehicle accident investigation and reconstruction and in the braking and handling capabilities of trains. Bentley made various calculations regarding the braking time needed to allow the ambulance to clear' the crossing. Based upon the depositions of the parties and witnesses, he testified that he made several calculations based upon a train speed of 24 and 25 miles per hour. With those speeds, Bentley stated:
[A]t twenty-four miles per hour in order to get 1.09 seconds, that’s the maximum time that the ambulance needs to clear the crossing, that it — the train could be placed in emergency [braking] four hundred and ten feet back from collision and no collision would occur. Also, if at the lowest speed for the ambulance, had ... an emergency [braking application] been made three hundred and seventy-seven feet back from the crossing, the collision would not have occurred. Now, at twenty-five miles per hour, the train would have to go into emergency [braking] four hundred and thirty-five feet back from the crossing in order to arrive 1.1 seconds later, and let the ambulance clear at sixty, and if it made an emergency application at twenty-five, four hundred feet back from the crossing, then the ambulance would be able to clear even if it had been running at a speed of seventy-
Our reading of the record establishes no conflict in the train crew’s testimony which would cause us to upset credibility determinations reached by the jury. The evidence is uncontradicted that because of the long-end forward configuration of the locomotive, Buckner, the engineer, never knew that an ambulance was speeding to the crossing with its emergency lights flashing. The evidence is likewise unrefuted |uthat Mayo saw the speeding ambulance and merely assumed the ambulance would either clear the crossing or come to a halt prior to the crossing.
In our view, the sight-impeded configuration of the locomotive coupled with the approach of a speeding, emergency-lighted ambulance constituted a situation and an approach which was so unusual as to put an ordinarily prudent person on notice that the train should take emergency breaking measures to avoid the collision. In stark contrast, Mayo, knowing that the engineer could not see the approaching emergency vehicle, chose to simply relay a message to Buckner to slow down when emergency breaking should have begun by applying the emergency brake that was within his reach. Such limited action on the part of the *810 brakeman clearly violated the railroad’s operating rules that imposed a responsibility to crew members other than the engineer to initiate emergency procedures to stop the train when a situation required immediate action.
We find it significant that all the experts testified conclusively that had the train crew applied the emergency brakes as close as 300 feet from the crossing, the collision would have been avoided. All that was needed in the estimation of one of the experts was an additional 8/10ths of a second for the ambulance to clear the crossing. When we view this evidence in light of the railroad’s rules of operation, we find that the jury was manifestly erroneous in failing to find the railroad negligent under these circumstances and reverse its erroneous finding on this issue.
APPORTIONMENT OF FAULT
Upon a finding of negligence, La.Civ. Code art. 2323 reduces the claim of plaintiff in proportion to his degree of fault. Soileau v. South Central Bell Telephone Co., 406 So.2d 182 (La.1981). In allocating comparative fault, we must consider the nature of each party’s conduct and the extent of the causal relationship between that |i2Conduct and the damages claimed. Ingram v. Caterpillar Machinery Corp., 535 So.2d 723 (La.1988). Among the factors which may influence the degree of fault assigned are: (1) whether the conduct resulted from inadvertence or involved an awareness of danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985).
The record shows that Lejeune was proceeding to the scene of an accident to provide emergency medical attention to the husband of an accident victim who died. Because the medical emergency involved a heart attack in progress, Lejeune was steadily increasing the speed of his ambulance so that he could render medical assistance as quickly as possible. The record further shows that the setting sun hid the train from Lejeune’s sight as he traveled to the west and thus he did not see the train until he was almost at the crossing. In comparison, the Union Pacific train saw Lejeune’s emergency vehicle approaching and made only a minimal attempt to avoid the collision. Based upon the facts established in the record before us, we conclude that Lejeune’s fault was minimal. Thus we apportion fault 20% to Le-jeune and 80% to Union Pacific.
DAMAGES
Lejeune was hospitalized at Lafayette General Hospital from November 28,1988, to December 24,1988. At the time of his hospitalization, his injuries included a flailed chest on the left side, open fractures of the right tibia and fibula, together with multiple lacerations of his scalp, neck, and right arm. Diagnostic X rays showed that he suffered fractures of the right ulna, right fibula, right tibia, right femur, as well hgas a fractured dislocation of the left hip, cervical fractures involving C2 and C7 with a zygomatic left fracture, a broken nose, and a fractured left patella. Lejeune also had thirteen broken ribs.
Upon admission of Lejeune to the trauma unit, Dr. Paul Breaux conducted an exploratory laparotomy and inserted a chest tube on the left side. After anesthetizing Lejeune for surgery, Dr. John Cobb, an orthopedist, debrided Lejeune’s right tibia, and then performed a partial closure reduction. A splint was then temporarily applied. Inserted at the same time were a Penrose drain and a Steinmann pin for utilization of traction which were left in place until December 1. On the following day, Dr. Cobb performed an open reduction and internal fixation to repair a fracture dislocation of Lejeune’s left hip. Two malleolar screws were inserted at the fracture site of the shattered ball part of the hip joint and the posterior capsule of the left hip was repaired.
Subsequently, on December 5, Lejeune was seen for complaints of facial numbness, malocclusion, and blurred vision. At that time, the examining physician diagnosed Le- *811 jeune as having suffered a left zygomatic complex fracture. A CT scan of Lejeune’s head and face later showed that he suffered nasal fractures and a displaced trimalar fracture.
Approximately two weeks after Lejeune’s tibia and hip surgery, he was returned to surgery. In this surgery, Lejeune underwent an open reduction and internal fixation of the right ulna with a four hole plate, an open reduction and internal fixation of the right femur with a K-nail and two wires, and an open reduction and internal fixation of the right tibia with two IM nails.
When Lejeune left Lafayette General on December 24, he was not yet ambulatory. At the time of his discharge, he was taken to his parents’ home where |i4he received professional, skilled home health care and physical therapy. Lejeune testified that the active and range of motion exercises caused him significant pain in the lower right leg, the right thigh, and hip joint. Even though Le-jeune was not able to walk when he first went to his parents’ home, he learned how to utilize a sling to move back and forth between his bed and wheel chair. By the middle of January, Lejeune began attempting to walk.
Partially because of the effect of placing weight on his lower extremities, Lejeune’s left hip became extremely painful and required him to seek additional medical attention. X rays taken on January 12, 1989, at Our Lady of Lourdes Hospital showed that Lejeune had dislocated his left hip. Although the hip was repositioned and then immobilized on an abduction pillow, Lejeune experienced repeated dislocations of his hip, even after he began using a hip brace.
On January 27, 1989, Lejeune then transferred his orthopedic treatment to Dr. J. Lee Leonard. Recurrent problems with Le-jeune’s left hip caused his rehospitalization at Lourdes Hospital from February 15 — 18. During that time, a CT scan revealed that a deficiency in the head of the hip bone was causing the hip to dislocate. As part of an attempt to conservatively treat this recurring problem, Lejeune was fitted with a brace which helped keep the left hip in abduction and diminished its ability to rotate externally. Subsequently, on April 7, Lejeune left leg was fitted with a long air cast.
X rays taken in mid-July 1989, showed that although Lejeune’s right tibia was healing, he continued to be plagued with left hip problems. Indicative of his continuing problems, Lejeune dislocated his hip again on September 11, 1989. X rays taken in the first two weeks of December showed the onset of arthritis in the left hip together with a narrowing of the joint space.
Iigln June of 1990, medical examination revealed that Lejeune’s right femur and tibia were healed and some of the supportive hardware could be removed. Accordingly, Lejeune was rehospitalized on September 18, 1990, and, with the exception of one rod in the right tibia, the supportive hardware was surgically removed.
Medical examination on October 30, 1991, revealed continued degeneration of Lejeune’s hip and specifically showed the onset of traumatic arthritis. Because of the chronic pain Lejeune suffered with his hip, orthopedists in Boston, Massachusetts were consulted. These consulting orthopedists recommended that Lejeune undergo a cup arthroplasty, a surgical procedure which is offered as an alternative to a total hip replacement. After carefully considering his options and giving further time for his hip to heal, Lejeune opted to undergo the cup arthroplasty at Lourdes Hospital on June 5,1992.
The medical testimony showed that even though Lejeune successfully underwent the cup arthroplasty, he will nevertheless need a total hip replacement at the age of 35. When asked to describe the present condition of Lejeune’s hip, the orthopedist testified that Lejeune has the hip of a person who is 70 years of age. He further stated that although Lejeune undergoes a total hip replacement at the age of 35, such a procedure functions only 10 to 15 years. Ultimately, even with a successful hip replacement, when Lejeune will be in his late 40’s or 50’s, the only option available to him will be a hip fusion. With his hip fused, Lejeune will be left with no mobility and no range of motion.
The evidence further showed that Lejeune returned to the employ of Acadian Ambu *812 lance after a long period of convalescence. Initially, Lejeune worked as a part-time dispatcher; later, he began riding in the ambulance and assisted emergency | ^personnel as he did prior to the accident. When the orthopedic hardware was removed in 1990, he stayed out of work for approximately two weeks. Later, when he underwent the cup arthroplasty, he stayed away from work for six months. Notwithstanding his return to work, the evidence preponderates that Le-jeune could not perform his job as he once did, that his hip continued to become dislocated, and that he suffered excruciating pain as a result of his injuries. Because of the difficulties he encountered on the job, Le-jeune returned to school to earn his degree in nursing.
Despite Lejeune’s eagerness to return to his former profession and his further education in the medical field, Jeffrey Peterson, a vocational rehabilitation specialist, observed that Lejeune would not be able to retain his former job or be able to withstand the rigors of a nursing position that would require long periods of standing and the lifting of patients. Because of the danger that Lejeune’s medical condition presented, both to himself and to others, Peterson testified that Lejeune would have to be retrained in a new field. He approximated that the cost of rehabilitation for Lejeune would be between $150,000 and $160,000.
There was also testimony of Dr. Michael Kurth, an expert economist, on Lejeune’s total past and future economic loss. Lejeune was 23 years of age at the time of the accident. After thoroughly reviewing Le-jeune’s medical condition, his need for retraining, his long expected work-life expectancy, and the limitations that his medical problems placed on his future employability, Dr. Kurth estimated that Lejeune’s total past and future economic loss was $815,894.' No testimony was presented opposing Dr. Kurth’s approximations of economic loss.
The court of appeal may fix the quantum in a suit for damages, where the trial court rejects plaintiffs demand on the basis of liability, and the appellate court | ^reverses the issue of liability on appeal. Courville v. Piggly Wiggly Bunkie Co., 614 So.2d 1366 (La.App. 3 Cir.1993). It is likewise well established that the primary purpose of the judge in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under the facts shown to exist in his case. Reck v. Stevens, 373 So.2d 498 (La.1979). Based upon the injuries established in the case sub judice, the record testimony of the pain and suffering Lejeune endured at the scene as he was extricated from the ambulance, his pain and suffering during his hospitalizations, his continued day-to-day pain, the pain and suffering he will undoubtedly experience in the future, together with his economic loss, past and future, and the retraining he will need, we find that an award of 1.5 million dollars is justified in the present case.[4] In addition, medical expenses of $104,334.59 were established and are awarded herein.
DECREE
For the foregoing reasons, the judgment of the trial court is reversed and set aside, and judgment is hereby rendered as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of STEPHEN R. LEJEUNE and against MISSOURI PACIFIC RAILROAD COMPANY d/b/a UNION PACIFIC RAILROAD COMPANY in the full and true sum of $1,500,000, reduced by plaintiffs percentage of fault, 20%, together with legal interest from the date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that there be judgment herein in favor of STEPHEN R. LEJEUNE and against MISSOURI PACIFIC RAILROAD COMPANY d/b/a UNION PACIFIC RAILROAD ¡ 18COMPANY in the full and true sum of $104,334.59, reduced by plaintiffs percentage of fault, 20%, representing the medical expenses incurred in the treatment of Stephen R. Lejeune, together with legal interest until paid.
*813 IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the intervention of COMMERCIAL UNION INSURANCE COMPANY is recognized and that MISSOURI PACIFIC RAILROAD COMPANY d/b/a UNION PACIFIC RAILROAD COMPANY is hereby ordered to pay Commercial Union Insurance Company by preference and priority for weekly indemnity benefits, totaling $17,255.32, reduced by plaintiffs percentage of fault, 20%, and medical expenses in the amount of $104,334.59, reduced by plaintiffs percentage of fault, 20%, together with legal interest thereon from date of judicial demand, until paid.
IT IS FURTHER ORDERED that court costs at both the trial and the appellate levels be borne 20% by Stephen R. Lejeune and 80% by Union Pacific.
REVERSED AND RENDERED.
WOODARD, J., dissents.

. The record shows that Landry’s settlement totaled approximately eight million dollars.

. Although the court minutes indicate that the verdict was unanimous, the record indicates that the verdict was ten to two.

. The trial court never reached the issue of the admissibility of the affidavit. Instead, this issue was precluded when it found no merit to the post-verdict motions brought by Lejeune and Commercial Union.

. We note that the amount awarded is the sum Lejeune requested in brief. After considering the record evidence, we feel that the amount requested is reasonable for injuries this extensive and of such duration; therefore, we will award this amount.