h SAUNDERS, Judge.
This matter arises from an accident wherein fourteen-year-old Veda Harvey was thrown from a carnival ride, the Swinger, at the October 1997 Swine Festival in Basile, Louisiana. The young girl suffered several injuries and ultimately lost one kidney. Suit was brought and a bench trial was had which resulted in the trial judge’s conclusion that the ride owner, D’Heilly & Sons, and the Swinger operator, Jerry Lynn Lightfoot, were not at fault. We affirm as amended in part, reverse in part, and render.

FACTS

On October 31, 1997, at the Swine Festival in Basile, Louisiana, Veda Bates and her sister, Neda Bates, went to the Swine Festival on what was known as “kiddie day,” which was a day set aside to allow children to ride all the rides for a single price. Veda, Neda and several other children boarded the Swinger ride. The Swinger was fully loaded and many of the children chained themselves into the ride. The operator walked around the ride, visually checking or pulling on the restraint chains to ensure that every rider was chained in properly. The ride started and the swings began to revolve around the hub of the Swinger. Sometime between the fifth or sixth revolution, Veda was observed kicking her feet and leaning forward in her chair. Veda was verbally reprimanded and the ride continued. The operator testified that he verbally reprimanded Veda three times before the accident happened. At some point between the eleventh and twelfth revolution of the ride, Veda, as stipulated to by the parties, unhooked the chain on her swing and leaned forward in her seat, after which Veda was thrown from her chair and hit a trailer. Shortly thereafter, the ride was brought down. The ride was operated by Jerry Lynn Lightfoot and the ride was owned by D’Heilly & Sons, both named defendants in this suit, hereinafter “Defendants.” Veda was taken to a nearby hospital and was treated for multiple | ¡Injuries, including a fractured pelvis; due to a severely damaged renal artery, she ultimately had a kidney removed.

LAW AND ANALYSIS

John Harvey, on behalf of his minor child, Veda Bates Harvey, and Robert and Josie Major, et al., hereinafter “Plaintiffs,” have brought this appeal, arguing that the trial judge manifestly erred in finding that the actions of Veda were the sole cause of the accident, that the operator did not have a duty to shut down the Swinger ride when he observed horseplay, that the operator’s duty to shut down the ride in the presence of horseplay had not been breached, and finally that the operator’s failure to shut down the ride did not cause the damages suffered by Veda.
I. Standard of Review
Evans v. Lungrin, 97-541, p. 6-7 (La.2/6/98); 708 So.2d 731, 735, provides *357 the standard of review of both factual and legal error:
It is well-settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court’s finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo.
(Citations omitted.)
II. Duty op Maintenance and Inspection
Whether a duty is owed is a question of law, and whether that duty is breached is a question of fact. Mundy v. Dep’t. of Health & Human Resources, 620 So.2d 811 (La.1993). Plaintiffs seek a de novo review of the record, arguing that the trial judge committed legal error in determining what duty of care was owed by the operator of 13the ride to its patrons. To assert that an operator owes a “very high degree of care” to its patrons, Plaintiffs cite Jenkins v. Ferguson, 357 So.2d 39 (La.App. 3 Cir.1978), in which this court made a res ipsa loquitur finding against the operator of a Scrambler ride where a locking device failed, and there was no other explanation for the door of the ride having flown open. In Jenkins, using the language, “the law places a very high degree of care on the operator of an amusement device such as this,” we cited Archote v. Travelers Insurance Co., 179 So.2d 658 (La.App. 4 Cir.1965). However, a look at the language in Archote, reveals that a reasonable, as opposed to high duty of care, was imposed. In Archote, the amusement devices were pool sticks, which the proprietor was well aware patrons routinely abused and misused. With the foreseeable harm that might follow from mistreated pool sticks, such as splintered wooden edges like the ones which were rammed into the plaintiffs thumb, the Fourth Circuit in Archote found that the proprietor had a duty of care to protect against injuries arising therefrom. The Archote court explained that duty as follows:
The applicable general law seems clear. The duty of the proprietor of an amusement place to his patron is that of a business invitee. He impliedly represents that he had used reasonable care in inspecting and maintaining the premises and equipment furnished by him and that they are reasonably safe for the purposes intended.
Id. at 660.
Plaintiffs stopped short with Jenkins, 357 So.2d 39, to argue what they believe the duty of care should be; a review of the jurisprudence as cited by Defendant[1], along with the above analysis of Jenkins compels us to find that the duty of care owed by Defendants was the reasonable maintenance and inspection of its equipment. ^Accordingly, we disagree with Plaintiffs’ assertion under Jenkins that the trial judge made a legal error in holding Defendants to a reasonableness standard of care.
III. Duty of Care: Duty to Reduce the Risk of Rider Injury
Plaintiffs next argue that the foreseeability that Veda, as a child rider, *358 might horseplay gave rise to a duty to the operator to guard against harm that might arise therefrom. We note, as did the court in Rivere v. Thunderbird, Inc., 353 So.2d 346, 348 (La.App. 1 Cir.1977):
[T]hat recurring throughout the jurisprudence of this state is the consistent rule that a proprietor of a place of public amusement is not an insurer of the safety of his patrons. Citing Givens v. De Soto Bldg. Co., 156 La. 377, 100 So. 534 (1924); Cassanova v. Paramount-Richards Theatres, 204 La. 813, 16 So.2d 444 (1943); Gilliam v. Serrano, 162 So.2d 32 (La.App. 1 Cir.1964), writ refused, 246 La. 77, 163 So.2d 356; Spiers v. Lake Shore Enterprises, Inc., 210 So.2d 901 (La.App. 1 Cir.1968).
Such a proprietor will be liable, however, if he is guilty of negligence. Pate v. Skate Country, Inc., 96-0364 (La.App. 4 Cir. 10/9/96); 682 So.2d 288. In finding Veda 100% at fault, the trial judge explained in his reasons for judgment:
[Tjhis court does not find that defendant D’Heilly was under an obligation to shut down the ride as argued by the plaintiffs, and the Court does not find that this failure to do so was a breach of duty which caused Veda’s injuries and damages.
In this conclusion, we find legal error. The operator of a ride, like the Swinger, has a duty to reduce the risk of injury to riders by shutting down the ride when dangerous or unsafe activity is observed, as admitted by Lavergne D’Heilly and as testified to by Defendants’ expert, Dan W. Dudley. Much testimony was given by both sides establishing that safety must be a foremost concern of operators. We simply cannot agree that an operator has no duty to guard against accidents caused by clearly unsafe and dangerous behavior exhibited by patrons of rides, who, for the most part, are young children. Where the trial judge found no such duty, we find legal error and review the record de novo.
| RIV. A De Novo Review: Negligence Analysis
Boykin v. Louisiana Transit Co., Inc., 96-1932, p. 8-9 (La.3/4/98); 707 So.2d 1225, 1230, sets forth the duty risk analysis used to determine negligence in Louisiana:
The determination of liability in a negligence case usually requires proof of five separate elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) proof that the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).
(Citations omitted.)
A) Duty to Maintain
With regard to Defendants’ duty to reasonably maintain the Swinger, we apply the “reasonableness” standard and consider the trial judge’s determination that Defendants acted reasonably in their maintenance and inspection of their equipment. Regarding inspection, the evidence indicates, at the time of the accident, the amusement rides were routinely inspected before the start of every show, fair or carnival, and the rides were inspected once a year by a Narso (National Association of Ride Safety Officials) certified inspector. Regarding maintenance, Defendants also had a duty of reasonable care to maintain the Swinger ride; here we find the trial judge improperly found Defendants did not violate this duty of care. The maintenance issue asserted by Plaintiffs focuses on Defendants’ failure to maintain seat-belts on the Swinger. The record indicates that at no time during Defendants’ ownership and operation of the Swinger *359 ride were seatbelts ever present, nor were they present when they purchased the ride. It is, however, undisputed that seat-belts were part of the manufacturer’s specifications and that Defendants had notice in the manual for the Swinger, that seat-belts were intended to be a part of the ride’s restraining system. | ^Plaintiffs contend that this fact, taken alone, should form a basis for liability. Both experts, William Avery and Dan Dudley, testified that the Swinger should have had seatbelts in accordance with the manufacturer’s instructions. Defendants argue that the absence of seatbelts was not unreasonable where the regular inspections by Narso inspectors never indicated that the Swinger was in anything but proper and safe working order. In light of the manufacturer’s clear specifications and the expert testimony, we find error where the trial judge declined to find Defendants’ reliance on the failure of the Narso inspectors to require the seatbelts unreasonable, where Defendants knowingly and purposefully ignored the manufacturer’s specifications. Thus, we find Defendants breached their duty of maintenance.
 The next question then must be whether the absence of seatbelts was a cause-in-fact of the accident leading to her injuries. “Cause-in-fact usually is a ‘but for’ inquiry which tests whether the accident would or would not have happened but for the defendant’s substandard conduct.” Boykin, 96-1932, p. 9; 707 So.2d at 1230. And so we consider the statement: Veda would not have been hurt but for the absence of a seatbelt. We find the record does not support this statement. It is the Plaintiffs’ burden to prove the causal relationship between the absence of seatbelt and the resulting accident. While we agree that the seatbelts should have been there, as specified by the manufacturer, the Plaintiffs have offered nothing more than conjecture as to what might have been different if the seatbelts were present. Plaintiffs offered only the suggestion that the seatbelts may have bought Light-foot more time to stop the ride, however, Lightfoot did not stop the ride until after the accident happened. Neither the nature of the seatbelts’ construction nor how they might have prevented Veda from flying out of the seat simply was established. Accordingly, we find that Plaintiffs have failed to establish the cause-in-fact element |7of the negligence analysis as it relates to Defendants’ breach of its duty of maintenance.
B. Duty to Reduce Risk of Injury
We have found Defendants owed a duty to its riders to reduce the risk of injury by stopping the ride once unsafe behavior is observed. So, we consider whether Veda exhibited behavior that was reasonably construed as unsafe, and whether the operator timely reacted to any unsafe behavior. At the time of the accident, Jerry Lynn Lightfoot was employed by D’Heilly & Sons and was the operator of the Swinger ride. Lightfoot testified that on the fifth or sixth revolution of the ride, he observed Veda “kicking and leaning forward,” he explained he yelled at her, telling her to quit horseplaying. Later during the ride, Lightfoot recalled he again saw her “leaning forward and she was kicking at the seat in front of her.” He yelled at her a second time. Lightfoot then explained that around the eleventh or twelfth revolution of the ride, Veda went back to kicking and leaning. He stated he was about to stop the ride when he heard the thump of Veda’s body hitting the nearby trailer. Lightfoot explained that he believed he had discretion to determine when a rider’s actions warranted stopping a ride and that he essentially followed a “three strikes and your out” rule, where after three warnings, he would then shut down a ride. We note that this self-determined measure of when to stop a ride is not reflected in the Operating Instructions for all rides. Lightfoot testified that he had read and was aware of the Operating Instructions which clearly state that “[i]f a patron refuses to follow the safety guide *360 lines of the ride, turn the ride off and politely ask the person to leave.”
William Avery, an expert in the field of amusement ride safety and operations, testified that the activity Veda exhibited was horseplay, “rider error,” and that if an operator observed such activity, he should have stopped the ride. By Lightfoot’s own admission, Veda clearly exhibited dangerous and unsafe behavior beginning in the Isfirst few rounds of the ride. It is also clear that Lightfoot did not begin the shut down of the ride until after she exhibited unsafe behavior on three occasions and after she flew out of the swing. Given the very nature of carnival rides which attract children of all ages, operators must adhere to a more exacting vigilance than that demonstrated by this operator. Accordingly, we find Veda did exhibit unsafe behavior, giving rise to Lightfoot’s duty to timely bring down the ride, which he breached.
To determine causation, we consider the statement: Veda would not have been hurt but for Lightfoot’s failure to bring the Swinger down upon his viewing her unsafe behavior after she engaged in it the first, second or third time. The record readily supports the conclusion that had Lightfoot stopped the Swinger, Veda’s injuries could have been, at the very least, reduced by the slowed momentum of the stopping ride. Plaintiffs emphasize that Lightfoot’s failure to act was not only a cause-in-fact, but the legal cause of the accident. “The scope of protection (legal cause) inquiry is a question of policy whether the particular risk falls within the scope of the duty.” Nicholson v. Calcasieu Parish Police Jury, 96-814, p. 6 (La.App. 8 Cir. 12/11/96); 685 So.2d 507, 511. As in our earlier discussion where we found that an operator has a duty to reduce the risks associated with unsafe behavior of riders, we find that it was clearly within the scope of Lightfoot’s duty to guard against the unsafe behavior of Veda by removing her from the ride upon his observation that she posed a risk to herself and others. We agree with Plaintiffs that Lightfoot’s failure to bring the ride down timely was not only a cause-in-fact, but also a legal cause for the resulting accident.
V. Veda’s Actions
The foregoing discussion does not diminish, however, the undisputed fact that Veda unlatched the restraining chain on her swing. Clearly, but for this action on Veda’s part, she would have been contained within her seat. Hence, finding that both laLightfoot and Veda played causative roles in bringing about the accident, we consider the comparative fault of the parties. La.Civ.Code art. 2323(A) provides:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person’s insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person’s identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
This court has discussed the comparative fault inquiry in Lejeune v. Union Pacific Railroad, 96-294, p. 11-12 (La.App. 3 Cir. 3/12/97); 693 So.2d 804, 810:
Upon a finding of negligence, La.Civ. Code art. 2323 reduces the claim of plaintiff in proportion to his degree of fault. Soileau v. South Central Bell Telephone Co., 406 So.2d 182 (La.1981). In allocating comparative fault, we must consider the nature of each party’s con *361 duct and the extent of the causal relationship between that conduct and the damages claimed. Ingram v. Caterpillar Machinery Corp., 535 So.2d 723 (La.1988). Among the .factors which may influence the degree of fault assigned are: (1) whether the conduct resulted from inadvertence or involved an awareness of danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985).
Clearly, Lightfoot was in the best position to guard against the disastrous results of unsafe activity that children might engage in while riding the Swinger. Veda, however, was not a small child; she was fourteen years old at the time of the accident, she purposefully unlatched her chain, and she presumably knew that unchaining her seat was at least wrong, if not dangerous. In light of all of the circumstances giving rise to this accident, we find that the actions of Lightfoot and Veda were equally at fault.
VI. Damages
ImThe court of appeal may fix the quantum in a suit for damages, where the plaintiffs demands based on liability were rejected at trial, but the court of appeal reverses the liability finding on appeal. Courville v. Piggly Wiggly Bunkie Co., Inc., 614 So.2d 1366 (La.App. 3 Cir. 1993). Where general damages are assessed by a trial court, the trial judge must concentrate on the particular injuries involved and the effect of those injuries on the particular plaintiff involved without first resorting to prior jurisprudence. Reck v. Stevens, 373 So.2d 498 (La.1979). Similarly, as we assess general damages for the first time on appeal, we must particularize the injuries Veda suffered.
Veda’s stipulated medical bills are $31,754.40. Regarding general damages, Plaintiffs seek an award in the range ■ of $250,000.00. The record indicates Veda suffered a severed renal artery, which led to much blood loss and consequent blood transfusions, and ultimately the removal of a kidnéy. Her ribs and pelvis were fractured and her liver was insignificantly bruised. Veda spent several days in traction during the two weeks she was hospitalized. When she left the hospital, she had to use a walker until the middle of December; thereafter she kept a limp, which disappeared sometime in February. Veda stated at trial that she once had hopes of a modeling career, but since the surgery, made necessary by the accident, left a large keloid scar running down the length of her torso, she had to give, up that idea. Further, Plaintiffs note that Veda experienced particular anguish during this time because the accident rendered her incapable of caring for her dying, adoptive mother. We note Dr. Frank P. Savoy’s deposition testimony, which indicates Veda will be twice as susceptible to renal failure than she was before she lost a kidney.
Defendants counter Plaintiffs’ estimation of general damages by noting that Veda made a relatively quick and uncomplicated recovery, and she readily resumed the competitive sports that she was involved in before the accident.
In Considering the foregoing injuries suffered by Veda, we award to Plaintiffs $31,754.40 in special damages, plus $150,000.00 in general damages for the pain and suffering associated with Veda’s kidney removal, scarring and general recovery, all to be reduced by 50% as a result of our comparative fault finding.

CONCLUSION AND DECREE

In light of the foregoing discussion, we reverse the trial court’s finding Veda 100% liable for the accident that occurred on October 31, 1997. Rather, we find Defendants’ breached their duty of care when *362 Lightfoot negligently failed to bring down the Swinger ride upon observing Veda’s repeated dangerous behavior. We find, however, that Veda was also equally at fault in the accident; therefore, we reduce her awards of $31,754.40 in medicals and $150,000.00 in general damages by 50% to award her $15,877.20 in special damages and $75,000.00 in general damages. Costs of trial and appeal are to be borne equally by both parties.
AFFIRMED AS AMENDED IN PART; REVERSED IN PART; AND RENDERED.
AMY, J., dissents and assigns reasons.

. Pate v. Skate Country, Inc., 96-0364 (La.App. 4 Cir. 10/9/96); 682 So.2d 288; May v. Mitchell Bros., 97-1270 (La.App. 1 Cir. 5/15/98); 712 So.2d 622; and particularly, Rivere v. Thunderbird, Inc., 353 So.2d 346 (La.App. 1 Cir. 1977).