935 So.2d 269 (2006)
Lee Carlton WILLIAMS and Margaret Williams, Plaintiffs-Appellees
v.
Dr. Jose Romero ENRIQUEZ and The Medical Protective Company, Defendants-Appellees.
No. 41,200-CA.
Court of Appeal of Louisiana, Second Circuit.
June 28, 2006.
*271 Snellings, Breard, Sartor, Inabnett & Trascher, L.L.P., by Donald J. Anzelmo, Monroe, for Appellant Louisiana Patients Compensation Fund Oversight Board.
Nelson & Hammons, by John L. Hammons, A. Cornell Flournoy, Shreveport, Felix J. Bruyninckx, III, Monroe, for Plaintiffs-Appellees.
Before BROWN, PEATROSS, and DREW, JJ.
BROWN, Chief Judge.
Defendant, the Louisiana Patient's Compensation Fund, has appealed from the trial court's judgment awarding damages to plaintiffs, Lee Carlton Williams and Margaret Williams, to compensate them for the losses they sustained as a result of malpractice committed by Dr. Jose Romero Enriquez. For the reasons set forth below, we affirm.

Factual and Procedural Background
On May 17, 1991, Lee Williams sustained a hydraulic injection injury to his hand while working on farm equipment in Richland Parish. He was taken to the emergency room at the Richland Parish Hospital in Delhi by his wife Margaret. Dr. Jose Romero Enriquez administered antibiotics and pain medication to Williams and washed the wound with saline solution. Dr. Enriquez sutured a small drain tube in the wound and released Williams with instructions to return the next morning for a dressing change.
Although Williams experienced excruciating pain that evening, he returned to the emergency room the following morning as instructed by Dr. Enriquez. At that time, he was referred to the St. Francis Hospital in Monroe where he underwent emergency surgery performed by Dr. Doug Liles, an orthopedic surgeon. Williams remained in St. Francis for approximately 47 days, undergoing 14 surgical procedures, including *272 the amputation of his right index and middle fingers. Williams' hand also required reconstructive and plastic surgery as well as a skin graft which involved the sewing of Williams' hand to his abdomen for seven weeks.
Lee and Margaret Williams filed a medical malpractice claim against Dr. Enriquez in accordance with the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41, et seq., for failure to properly diagnose and treat the hydraulic injection injury, specifically, for Dr. Enriquez's failure to advise Williams of the immediate need for surgical intervention for his wounded hand. On November 18, 1993, a medical review panel concluded that there remained material issues of fact not requiring expert opinion, bearing on liability which should be determined by a court. On January 28, 1994, the Williams instituted a medical malpractice suit against Dr. Enriquez and his insurer, the Medical Protective Company. Trial was bifurcated and on the issue of Dr. Enriquez's liability, the court found in favor of the Williams. This court affirmed the judgment on appeal in an unpublished opinion.
On December 18, 2001, the trial court approved a settlement agreement between Lee Williams and Dr. Enriquez in the amount of $100,000 plus accrued interest, specifically reserving all rights of the Williams to seek additional damages from the Patient's Compensation Fund ("PCF") for malpractice. The PCF answered the suit on November 6, 2002. Following trial, the court rendered a judgment that did not specify which portion of the total award was owed to Lee Williams and which sum was owed to Mrs. Williams, nor did the judgment allocate damages by class or category. Thus, this court reversed and remanded as an indeterminate judgment. See Williams v. Enriquez, 40,305 (La.App. 2d Cir.11/17/05), 915 So.2d 434.
On December 29, 2005, consistent with this court's opinion in Williams, supra, the trial court awarded Lee Williams $450,000 in general damages, $94,248.10 in medical expenses, and $50,000 for past economic loss. Margaret Williams was awarded $50,000 for loss of consortium. The $100,000 payment made by Medical Protective Insurance on behalf of Dr. Enriquez was deducted from the total general damage award of $450,000 in favor of Lee Williams.
It is from this judgment that the PCF has appealed.

Discussion

Expert Testimony
The PCF argues that the trial court erroneously failed to give the testimony of Dr. Doug Liles, one of Williams' treating physicians, greater weight than the testimony of two of plaintiffs' expert witnesses, Drs. John Knight and Scott Garberman.
Dr. Liles testified that he first saw Lee Williams 18 hours after the accident. Dr. Liles observed that the number one factor which determines the outcome for a patient with a high pressure injection injury is the magnitude of the initial injury. Dr. Liles testified that he found hydraulic brake fluid within an inch of each incision he made. Dr. Liles stated that Williams "had a devastating hand injury, no matter when he was seen. I think even if I'd have operated on him initially, he would have had probable loss of a digit and certainly loss of function in the hand," and "he (Williams) may have loss less digits from earlier surgery. Whether those digits would have been functional is doubtful." Dr. Liles admitted that he had only one experience with a high pressure hydraulic injection injury.
Dr. Liles testified that the appropriate treatment for Williams' injury would have been "immediate surgery." Further, Dr. *273 Liles stated that earlier surgery would have probably saved at least one finger from amputation with considerably less loss of tissue, and that Williams would have retained more gross function including the ability to grasp a wrench and similar objects.
Dr. John Knight and Dr. Scott Garberman are both orthopedists specializing in hand surgery, each possessing substantial experience with high pressure hydraulic injection injuries. Neither Dr. Knight nor Dr. Garberman treated Williams. Both physicians testified that, had Williams been treated immediately, he should have been able to return to work and normal functions within three to four months without any tissue loss, no amputation, and only very mild functional loss, leaving Williams largely capable of performing most of the tasks required of a farmer.
Dr. Garberman testified that Williams experienced intense pain, requiring intravenous morphine which is usually reserved for end-stage cancer patients. Dr. Knight testified that most puncture wounds do not require the administration of intravenous or intramuscular narcotics.
Dr. Garberman stated that if appropriate surgical intervention had been instituted between 6 and 12 hours after the injury, Williams would have had approximately a 70% success rate in maintaining the gross motor skills in his hand, and further noted that the failure of Dr. Enriquez to refer Williams for surgical intervention reduced the chances of success to 10%, which amounted to a 60% lost chance of success.
Dr. Garberman emphasized that the negligent delay of referral resulted in Williams suffering permanent disability and loss of function of his right hand, amputation of two fingers, and Williams having to undergo extensive reconstruction of the hand in the form of the skin flap. Dr. Garberman and Dr. Timothy Mickel, Williams' plastic surgeon, agreed that Williams suffered approximately a 91% permanent impairment of his dominant right hand and a 55% permanent impairment of his body as a whole.
Dr. Knight's testimony did not differ from that of Dr. Garbermans. Dr. Knight unequivocally stated that Dr. Enriquez discharging Williams with instructions to come back the following day directly caused the additional treatment that Williams had to undergo.
Dr. Garberman and Dr. Knight confirmed that the severe psychological problems experienced by Williams, including depression, were a recognized risk of medical malpractice, as were the resulting pain, disfigurement, and disability. They also noted that these psychological issues are real concerns.
While it is permissible for the trier of fact to give greater weight to the testimony of a treating physician over the testimony of a doctor whose examination was made solely for the purpose of giving expert trial testimony regarding a patient's condition, the factfinder can, after weighing and evaluating all of the medical testimony, accept or reject the opinion expressed by the treating physician. Kennedy v. Thomas, 34,530 (La.App. 2d Cir.04/04/01), 784 So.2d 692; Vaughn v. Progressive Security Insurance Company, 03-1105 (La.App. 3d Cir.03/02/05), 896 So.2d 1207.
As noted by this court in Corley v. State, Department of Health & Hospitals, 32,613 (La.App. 2d Cir.12/30/99), 749 So.2d 926, it is for the factfinder to evaluate conflicting expert opinions in relation to all of the circumstances of the case. Credibility determinations, including the evaluation and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which will not be *274 disturbed on appeal in the absence of manifest error. Id.; Simmons v. West, 29,633 (La.App. 2d Cir.06/18/97), 697 So.2d 688, writ denied, 97-2308 (La.11/26/97), 703 So.2d 647.
We have reviewed the testimony and find that the trial court's credibility evaluations and inferences of fact were reasonable. While the record shows that Dr. Liles is an excellent physician, it also reflects that Drs. Knight and Garberman are specialists in hand surgery, and have substantially more experience with hydraulic injection wounds to the hand than Dr. Liles. Further, Dr. Liles testified that the proper procedure for an injury such as the one sustained by Williams was immediate surgery. Dr. Liles did not see Williams until 18 hours after the initial injury, a period during which Dr. Enriquez's malpractice greatly exacerbated the harm caused to Williams' hand, thus potentially giving Dr. Liles a false impression as to the extent of the initial injury.

General Damages
The PCF next argues that the award of $450,000 in general damages, which amounts to $350,000 after the credit of $100,000 the PCF was entitled to by virtue of the earlier settlement by the insured physician, is abusively high.
General damages involve mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured exactly in monetary terms. Nelson v. City of Shreveport, 40,494 (La.App. 2d Cir.01/27/06), 921 So.2d 1111, writs denied, 06-0453, 06-0600 (La.05/05/06), 927 So.2d 313, 317; Sallis v. City of Bossier City, 28,483 (La.App. 2d Cir.09/25/96), 680 So.2d 1333, writs denied, 96-2592, 96-2599 (La.12/13/96), 692 So.2d 376, 1063.
The determination of the appropriate amount of damages is a factual determination entitled to great deference on review. La. C.C. art. 2324.1. The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award of damages, but rather to review the exercise of discretion by the lower court. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993). Before an appellate court may disturb an award of damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case under consideration. Youn, supra; Nelson, supra.
The trial court specifically considered the numerous surgeries that Williams endured; the attendant pain and suffering; the fact that he had his hand sewn to his side for seven weeks; the additional disfigurement of his hand and the resulting mental and emotional anguish; and the increase in the loss of function in Williams' hand, arm, and body as a whole. We further take note of the testimony of family members as to substantial lifestyle changes Lee Williams has had to make as well as the constant pain he still suffers more than 12 years post-accident. We are unable to say that under the fact and circumstances of this case the trial court abused its discretion in fashioning this general damage award.

Medical Expenses
The trial court awarded plaintiffs $94,248.10 for medical expenses. The PCF contends that this finding by the trial court is manifestly erroneous, and must therefore be reversed, or alternatively, reduced to a sum equal to ten to twenty percent of the total medical bills incurred by Williams.
Special damages, such as medical and related expenses, are easily measured. *275 Koehn v. Rhodes, 38,941 (La.App. 2d Cir.09/24/04), 882 So.2d 757; Eddy v. Litton, 586 So.2d 670 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1203 (La.1992). A plaintiff may recover past medical expenses that he incurs as a result of an injury due to the fault of another. The plaintiff must prove that, more probably than not, the medical treatment was necessitated by trauma sustained in the accident. Brandao v. Wal-Mart Stores, Inc., 35,368 (La.App. 2d Cir.12/19/01), 803 So.2d 1039, writ denied, 02-0493 (La.04/26/02), 814 So.2d 558. A tortfeasor is required to pay for the cost of medical treatment, including overtreatment and unnecessary treatment, unless the overtreatment was incurred in bad faith. Koehn, supra; Vines v. Wood, 34,555 (La.App. 2d Cir.04/04/01), 785 So.2d 126.
In awarding medical expenses, the trial court observed as follows:
At trial, plaintiffs introduced exhibits and medical bills and expenses totaling One Hundred and Six Thousand Seven Hundred Ninety Five Dollars and Eight-One Cents ($106,795.81). Some of those bills are not recoverable as items of damage. Plaintiffs would have incurred the emergency room expense at Richland Parish Hospital in Delhi regardless of the treatment by Dr. Enriquez. Therefore, the total bill of Five Hundred Forty Three Dollars and Thirteen Cents ($543.13) should not be included in the damage award. Additionally, plaintiffs include a medical bill from Richardson Medical Center totaling Twelve Thousand Four Dollars and Fifty Cents ($12,004.50) for treatment rendered to Mr. Williams from October 25, 2005, through November 6, 2002. A review of the medical records indicate that those expenses did not pertain to the events of May 17, 1991. Those expenses were incurred by Mr. Williams for treatment of a gastrointestinal problem and a voluntary admission for psychiatric treatment by Mr. Williams as a result of the untimely death of his son which caused him severe anxiety and depression. Therefore those expenses will not be allowed. The total medical expenses calculated by the Court is Ninety Four Thousand Two Hundred Forty Eight Dollars and Ten Cents ($94,248.10).
This assignment of error is without merit. The trial court carefully examined the invoices submitted by plaintiffs and limited its award of medical expenses to those directly related to the injuries which resulted from Dr. Enriquez's malpractice. We will not disturb the trial court's award of $94,248.10.

Loss of Consortium
The trial court awarded $50,000 to Mrs. Williams for loss of consortium. The PCF argues that this amount is abusively high.
Damages for loss of consortium are general damages, the assessment of which the factfinder is given much discretion. La. C.C. art. 2324.1; Etheredge v. St. Paul Mercury Insurance Company, 35,832 (La.App. 2d Cir.04/03/02), 814 So.2d 119. Loss of consortium has seven elements: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Id.; Bell v. USAA Casualty Insurance Company, 30,172 (La.App. 2d Cir.01/21/98), 707 So.2d 102, writs denied, 98-0712, 98-0766 (La.05/08/98), 718 So.2d 433, 434. Proof of any one of these elements is sufficient to support an award of loss of consortium damages. Whitaker v. Mullinax, 628 So.2d 222 (La.App. 2d Cir.1993), writ denied, 94-0382 (La.03/25/99), 635 So.2d 241; *276 Broussard v. Razden, 98-2576 (La.App. 1st Cir.12/28/99), 763 So.2d 644.
Lee Williams sustained a near total loss of his right hand as a result of the malpractice of Dr. Enriquez. Williams is chronically depressed because he is unable to farm or hunt, and the evidence indicates that this lasting state has taken a large toll on Mrs. Williams.
Margaret Williams testified that she and Lee, who met at church, were married in 1957. Mrs. Williams observed that it was "love at first sight." Together the Williams had three children: two sons, Donnie and L. C., and a daughter, Debbie. Margaret testified that since their marriage, she and Lee have made their home on his family's place in Mangham. She worked outside of the home for 40 years as a nurse's aide and Lee has been a farmer all of his life.
Mrs. Williams stated that family and farming are Lee's life. Before the accident, he didn't have many outside activities, although he did have some beagles and enjoyed rabbit hunting with them. From 1957 until Lee's accident in 1991, a typical day for the Williams would involve them waking up around 5:30 or 6:00 a.m.; her cooking breakfast; Lee and the four boys (she and Lee raised two nephews with their own children) heading off to the fields; and her cooking lunch for them before heading off to work herself. Mrs. Williams noted that Lee worked outside all day. He farmed cotton, beans, and corn, as well as hay.
At this point in Mrs. Williams' testimony, one of the attorneys got Lee Williams out of the courtroom so his wife could be candid with the court. Mrs. Williams then testified that after his lengthy recovery period, her husband still cannot do many of the things he used to be able to do without assistance, such as hooking up a tractor or changing a tire. She stated that Lee has pain and discomfort daily and sleeps very little at night, even though he takes something for pain. Personality wise, "he's almost hell on wheels ... [H]e's on my case all the time, he sees nothing good in what I do," stated Mrs. Williams. She noted that there had been a complete change from the way he had been before. Now that he has gotten rid of his cows, Lee does very little other than to mow the yard and sit in the house watching television. Although it has been hard for her to stay in the marriage, she does so because she married him "for better or worse."
In light of this testimony, we cannot say that the trial court abused its discretion by awarding Mrs. Williams $50,000 for loss of consortium in this case.

Past Economic Loss
The trial court awarded Williams $50,000 for his economic loss for the year of the accident, 1991, but declined to award anything for economic loss for any of the subsequent years. The PCF concedes that while Williams did have some loss the year of his injury, the evidence does not support the trial court's $50,000 award.
A plaintiff bears the burden of proving his claim for lost earnings. For purposes of determining this type of damages, the amount of lost earnings need not be proved with mathematical certainty, but by such proof as reasonably establishes the claim. Driscoll v. Stucker, 04-0589 (La.01/19/05), 893 So.2d 32; Corder v. Lively, 39,780 (La.App. 2d Cir.06/29/05), 907 So.2d 824. This proof may consist only of the plaintiff's testimony. Id. What is required to recover for actual lost wages is proof that the plaintiff would have been earning wages but for the accident in question. Boyette v. United Services Automobile Association, 00-1918 (La.04/03/01), 783 So.2d 1276; Corder, supra. The trial court is accorded broad discretion in assessing *277 awards for lost earnings. Stucker, supra.
Plaintiffs retained economist Dr. Charles Bettinger, an expert in forensic economics and statistics, who testified that Lee Williams had sustained a loss of earnings of $447,467 as a result of his injury. The trial court, in its written reasons for judgment, observed:
Dr. Bettinger's computation was based on past economic loss with no component for anticipated future lost income or earning capacity. Dr. Bettinger's opinion was based on his assumption that any losses sustained by Mr. Williams were caused by the accident. Dr. Bettinger did no research to compare plaintiff's operation with other farms in the area. Dr. Bettinger acknowledged that a number of factors affect the profitability of farming operations including factors such as weather, cost of seed, chemicals, fuel, and market demand. However, Dr. Bettinger did not consider those factors in assessing Mr. Williams' productivity and profitability.
Mr. Williams testified that the size and scope of his farm operation increased substantially after the accident. Mr. Williams testified that he had farmed approximately four hundred and fifty acres for ten to twelve years prior to the accident. Mr. Williams was assisted in his farm operation by his son Donnie and two hired men. Mr. Williams testified that after 1991, he and his son Donnie diversified their farm operation and the year prior to Donnie's untimely death, Mr. Williams was renting seven hundred to eight hundred acres of his own and he and Donnie farmed sixteen hundred to seventeen hundred acres of cotton, approximately eight hundred acres of corn, and approximately three hundred fifty acres of maize. Mr. Williams testified that he had continued to run a cattle operation but sold his cattle in 1993 or 1994 for reasons unrelated to the accident. Mr. Williams continued to raise yearlings through 2002. Mr. Williams testified that he lost income in 1991, the year of the accident. He testified that he did not lose income in 1992, 1993 or 1994. Mr. Williams testified that in every year through 1999 he had lost no money because of the accident. Mr. Williams testified that after his son Donnie's death in 2000, he planted approximately seven hundred acres of soybeans and fifty two acres of cotton, which was still more than the four hundred and fifty acres of corn he had planted in 1991. Mr. Williams testified that he did not make money in the year 2000 because of a drought. Dr. Bettinger attributed the 2000 crop loss to the accident.
Dr. Bettinger provided no documentary or other support for his opinions. The underlying assumption by Dr. Bettinger concerning the affect (sic) of Mr. Williams' injury is contradicted by Mr. Williams' ability to continue farming and increase the size and diversity of his farm operation. Mr. Williams acknowledged that the only loss incurred as a result of the injury incurred (sic) in 1991. Based upon the record of these proceedings the Court will award plaintiffs the sum of Fifty Thousand Dollars ($50,000) for economic loss. (Emphasis added).
The trial court's written reasons for judgment clearly show that the court evaluated the expert and lay testimony and decreased the amount of past economic loss based upon Williams' own testimony that the only year he sustained any economic loss as a result of the accident and his resulting injury was 1991. Contrary to the PCF's contention, it is not necessary *278 that past economic loss be proven with exactitude. See Stucker, supra; Corder, supra. This assignment of error is without merit.

Comparative Fault
The trial court rejected the PCF's claims of comparative fault.
The PCF asserts that the record contains evidence of two areas of comparative fault.
According to the PCF, the first act of comparative fault was Williams' unreasonable delay in reaching the emergency room. Mrs. Williams testified that the accident occurred at approximately 5:00 p.m., while Williams testified that the accident occurred sometimes between 4:00 and 5:00 p.m. The emergency room records indicate that Williams did not present until 6:20 p.m. The PCF contends that Williams negligently and unreasonably delayed presenting himself to the emergency room and that this delay was a major cause of any aggravation of the original injury.
The testimony of Lee, Margaret and Terry Williams consistently establishes that immediately following the accident, Williams' son Donnie telephoned Margaret and Terry, who immediately helped Williams into their vehicle before driving straight to the Richland Parish Hospital. It is not uncommon in an emergency situation for persons involved to fail to note exact times. Other than pointing out the alleged discrepancy in time, the PCF has absolutely no evidence in support of its argument that Williams delayed reaching the emergency room after suffering a severe injury to his hand. Plaintiffs' actions following Lee Williams' farm accident were not tantamount to fault and the trial court was not manifestly erroneous or clearly wrong in its factual finding to this effect.
The second act of comparative fault on the part of plaintiffs, the PCF argues, was their failure to mitigate damages. Mrs. Williams, a nurse's aide at the hospital in Delhi, testified that she was concerned that her husband was not receiving proper medical treatment from Dr. Enriquez. Based upon her training and this testimony, the PCF argues that Mrs. Williams had a duty to ignore the doctor's orders and "take steps to mitigate the consequences of the poor treatment."
An injured plaintiff has the duty to take reasonable steps to mitigate his damages. Aisole v. Dean, 574 So.2d 1248 (La.1991); Etheredge, supra. The burden rests on the tortfeasor to show that the injured plaintiff failed to mitigate his damages. The defendant must show that the plaintiff's conduct after the injury was unreasonable and that the unreasonable conduct had the consequence of aggravating the harm. Etheredge, supra.
It would defy logic for this court to hold Lee Williams, a farmer with a ninth grade education and his wife Margaret, a nurse's aide, to a higher degree of medical knowledge than the emergency room doctor responsible for his treatment and care. The discharge instructions of Dr. Enriquez directed the Williams to return to the emergency room the following day if necessary and could have even been construed as conveying that there was no need for further treatment. Luckily for all parties involved, the Williams returned to the Richland Parish Hospital emergency room the next morning as directed by Dr. Enriquez. The trial court did not err in finding no fault on the part of the Williams for their failure to second guess Williams' treating physician.

Conclusion
For the reasons set forth above, the judgment of the trial court is AFFIRMED. Costs are assessed to defendant, *279 the Louisiana Patients' Compensation Fund.