997 So.2d 125 (2008)
Alexis DOWNS, et al., Plaintiffs-Appellees,
v.
E.O.M. ENTERTAINMENT, INC., Defendant-Appellant.
No. 43,654-CA.
Court of Appeal of Louisiana, Second Circuit.
October 22, 2008.
*127 Elizabeth C. Brown, West Monroe, for Appellant.
Jefferson B. Joyce, Crawford & Joyce, Monroe, for Appellees.
Before BROWN, PEATROSS & DREW, JJ.
PEATROSS, J.
The defendant amusement park appeals in this case involving an injury sustained at a haunted house it operated. The trial court found in favor of Alexis Downs, who was allegedly hurt on the "coffin chute slide," and awarded him less than $2,400 in total damages. We affirm the trial court judgment.

FACTS
On October 31, 2005, Mr. Downs and his wife, Shannon, went to the Edge of Madness (E.O.M.) amusement park in Calhoun, Louisiana. Mrs. Downs' brother, an E.O.M. employee, had given them free passes. During their visit, they rode the coffin chute slide in the Castle exhibit.[1] The ride consisted of two separate slides. A rider would recline on the slide at an angle; when the trapdoor at the rider's feet opened, the rider then slid down into a pit filled with balls. Each slide had two operators and its own controls. One E.O.M. employee at the top of the slide opened the trapdoor by pushing a button; the trapdoor, which was made of sheet metal, opened upward. According to the person who installed the ride's electronic components, there was a 15-second delay before the trapdoor could reset. A pressure pad in the ball pit reset the trapdoor. A second E.O.M. employee stood at the bottom of the slide and told the operator at the top when to send the next rider. If the rider missed the pressure pad when landing in the ball pit, the employee at the bottom of the slide would go in the pit and hit it.
Mrs. Downs encountered no problems when she rode the coffin chute slide. According to Mr. Downs, however, when he rode it, the trapdoor on the slide clamped down on both of his shins, injuring his legs, particularly the left one.
In March 2006, Mr. Downs and his wife filed suit against E.O.M. Entertainment, Inc., which owned the amusement park. They alleged that E.O.M. failed to properly *128 maintain its facility or train its employees.
A bench trial was held in January 2008. In addition to their own testimony, the plaintiffs presented that of Mrs. Downs' mother, with whom they were living in October 2005, and Mr. Downs' employer at the time he was allegedly injured. Mr. Downs' medical records and the deposition of one of his treating doctors, Dr. William Morrison, were admitted into evidence. Testifying for E.O.M. were Carolyn Hill, who founded the amusement park and served as a corporate officer for E.O.M.; her husband, Dr. Lawrence Hill, who served as an onsite medical doctor for the park; their son-in-law, Jackie Lowery, who installed the electronic part of the coffin chute slide; Brian Hopkins, the head of E.O.M. security; and Diane McCaskal, a house captain for the Castle.
On February 12, 2008, the trial court issued its written ruling and judgment. It held that the plaintiffs "barely" carried their burden of proof as to whether the accident happened. The court found that Mr. Downs' injuries were minimal at best. Further finding that Mr. Downs "chose" not to go to work, as opposed to being "caused" to miss work due to his "injuries," the court awarded only $250 in lost wages. Noting that it was hard pressed to even see a scar, it awarded $200 for pain and suffering. Finally, the court awarded medical expenses of $1,860.98, although it stated that it found them "rather high."
The defendant appeals.

LIABILITY
In two assignments of error, the defendant contends that the trial court erred in finding that an accident even occurred, much less that E.O.M. was at fault for failing to maintain its equipment or properly train its employees. It insists that its amusement park runs "like a well oiled machine." In addition to having deputies present while it is open, it has its own security team and an on-duty physician. There are two "house captains" for each house whose jobs are to go through the house and make sure that the "actors" for that house are in place. The defendant maintains that had an accident occurred, there would have been several witnesses. It emphasizes the fact that Mr. Downs declined all offers of medical attention, as well as Ms. McCaskal's testimony that he smelled strongly of alcohol when she encountered him after it was reported to her that he had been injured.

Law
The duty of the proprietor or operator of an amusement place to his patron is that of a business invitee. He impliedly represents that he has used reasonable care in inspecting and maintaining the premises and equipment furnished by him and that they are reasonably safe for the purposes intended. Rivere v. Thunderbird, Inc., 353 So.2d 346 (La.App. 1st Cir.1977), writ denied, 354 So.2d 1380 (La. 1978); Harvey ex rel. Bates v. T.H.E. Insurance Company, XXXX-XXXX (La.App. 3d Cir.6/28/00), 764 So.2d 354.
A proprietor of a place of public amusement is not an insurer of the safety of his patrons. Rivere v. Thunderbird, Inc., supra; Harvey ex rel. Bates v. T.H.E. Insurance Company, supra; Hutchinson v. Knights of Columbus, Council No. 5747, XXXX-XXXX (La.2/20/04), 866 So.2d 228. However, such a proprietor will be liable if he is guilty of negligence. Harvey ex rel. Bates v. T.H.E. Insurance Company, supra.
In general, the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing them to unreasonable risks of harm or *129 injury. Mundy v. Department of Health and Human Resources, 620 So.2d 811 (La. 1993); Mosley v. Temple Baptist Church Of Ruston, Louisiana, Inc., 40,546 (La. App.2d Cir.1/25/06), 920 So.2d 355.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong; and, where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Cole v. Department of Public Safety & Corrections, 2001-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. State through Department of Transportation and Development, 617 So.2d 880 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989). To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra.
Where the fact finder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra.

Discussion
Mr. Downs and his wife went down separate slides on the coffin chute ride. Mr. Downs testified that when he was riding the coffin chute ride, it initially dropped him about a foot before the trapdoor clamped on his shins for 30 to 40 seconds. He stated that he asked the woman operating the slide to open it; eventually she did so and he descended into the ball pit, where he sat for three to five minutes. His wife testified that they should have come off the slides at about the same time, but she ended up at the bottom of her slide first. She did not see what happened when Mr. Downs was on the slide. However, she heard him "fussing." When she looked at his face, she said she could tell he was in pain. She went over to him; he pulled up his pants legs and she saw "goose eggs" on his shins.
They testified that a woman who worked at the haunted house led them to a back exit with a flashlight.[2] Mr. Downs stated that he sat down briefly; he and his wife then left without going through any of the other exhibits. According to Mrs. Downs, the lady who escorted them was polite, but did not offer medical assistance. The couple returned to her mother's house where they were living at the time. Mrs. Downs' mother testified that when they returned home that night, Mr. Downs' legs had big knots on them and he could hardly walk. At her insistence, he went to the emergency room two days later.
Diane McCaskal, a house captain at the Castle, testified that a team leader told her that a man had cut his leg and was hurt. She sought him out and found him sitting *130 on some steps near an entrance. He told her that he had injured his leg when he got caught on the slide. She saw a skinned up mark on his leg, but no goose eggs or knots. She testified that she offered him medical attention because Dr. Hill was at the park. According to Ms. McCaskal, he declined onsite medical attention from Dr. Hill, emergency room treatment, and her offer of Ibuprofen. She then escorted him and his wife through the Castle and to the entrance of the Insane Asylum, the next exhibit, where she left them. She said he walked without difficulty. Additionally, she testified that he smelled of alcohol; however, he did not seem impaired in any manner, including speech or ability to walk.
Ms. McCaskal was unable to recall the name of the team leader who initially told her that a man claimed to have hurt his leg. She was also unable to remember the names of the girls operating the slide that night. Dr. Hill testified that he worked on the coffin chute slide reading the disclaimer to potential riders and that he was near the operators who pushed the button to open the trapdoor; he could only identify the slide operators as being girls just out of high school. Mrs. Hill testified that she no longer had a list of the employees who worked that night.
The defendant relies heavily upon its safety procedures and policies to contend that no accident could have occurred. Dr. Hill and Mr. Hopkins both testified that had anyone been injured on a ride they would have been contacted, and they were not notified of Mr. Downs' claim of injury. Mrs. Hill testified that had Mr. Downs gotten stuck in the slide as he claimed, he would have been attended to by Ms. McCaskal, security and her husband.
However, Ms. McCaskal was, in fact, notified that Mr. Downs was injured, and she testified that she responded to the complaint. She observed that Mr. Downs' leg appeared as though he had skinned it, and she admitted that he told her that he had gotten caught in the slide. However, she did not summon security or the doctor, nor did she make a written report.
As to the E.O.M. safety procedures, the testimony established that the rules were unwritten. Mr. Hopkins testified that in the event of an accident or incident, the matter is to be reported to a security guard and then to him. He was adamant that he would have been notified if Mr. Downs had been injured in the manner he claimed. While he was aware of how security is informed of these rules, he could not say how the actors in the houses were instructed. He also testified that he worked maintenance parttime and that he checked each house personally every day to make sure things were running properly. He stated that at the first of each year it was operating, he would get in the coffin chute ride and try to hurt himself by raising his arms or feet or make it "hang up." While Mr. Hopkins purported to know how to work this ride, he was apparently unaware of the pressure pad at the bottom that reset the trapdoor, an important component of its operation.
In her testimony, Ms. McCaskal contradicted Mr. Hopkins' assertions about the safety procedures. She testified that their procedure started with the house captain. In the event of an injury, she testified that she would have gone to Mrs. Hill or Dr. Hill, not security; at most, she might have asked security for help finding them.
To the extent that a credibility call was made in the instant case, the trial court decided in favor of the plaintiffs on the issue of liability. Mr. Downs testified without contradiction that the trapdoor malfunctioned and closed on his legs. He immediately reported the injury, a fact corroborated by Ms. McCaskal, one of the *131 Castle's house captains, who observed that his leg was skinned up. Although a cornerstone of E.O.M.'s defense was that its safety procedures were such that no accident could have possibly happened without multiple witnesses seeing it and without the incident being reported to certain key personnel, even its own witnesses disagreed about the exact provisions of these procedures. Also, despite the fact that there were between two and four E.O.M. employees operating the coffin chute slide that night, none of them were produced by the defendant to contradict Mr. Downs' claim or testify that the slide was operating normally that evening. As to the inspection of the slide, while the head of security testified that he personally tried to force it to malfunction at the beginning of each year, the incident in question occurred on the last night of the last season for this particular amusement ride. On the issue of its maintenance, it is noteworthy that Mr. Hopkins, who appeared to have been the person primarily tasked with checking rides daily, lacked a clear understanding of the role played by a component of the slide as important as the pressure pad that reset the trapdoor.
Based on the circumstances of this case and in light of the trial court's credibility determination, we are unable to say that the trial court committed manifest error in finding in favor of the plaintiffs on the issue of liability.

"IMPOSSIBILITY DOCTRINE"
In this assignment of error, the defendant alleges that the trial court committed manifest error because it failed to find that the defendant had proven the "impossibility alleges doctrine" applied in this case.
At the conclusion of Mr. Hopkins' direct testimony, the trial judge remarked that in a case tried before him several years earlier, which involved a piece of glass found in some ice cream, "the theory of impossibility" had been argued and that he was reminded of that occasion by the testimony of the defendant's witnesses in the instant case. He suggested to the lawyers that they might want to mention this theory.
In its brief to this court, the defendant asserted that it had proven that it was "impossible" for Mr. Downs to have been injured in the way he described. On the other hand, the plaintiffs argued that, while they were unfamiliar with the "impossibility alleges doctrine," the trial court certainly was aware of it and still found in their favor.
Neither party cites any cases concerning this doctrine or theory. We cannot see how the "impossibility doctrine" of either contract or criminal law has any bearing on the instant case.[3] To the extent that the defendant is arguing that it demonstrated that it was physically impossible for Mr. Downs to have been injured in the manner he described, we find no manifest error in the decision of the trial judge who initially raised the issue to the lawyers to ultimately reject its application under the facts of this case and hold the defendant liable.

DAMAGES
The defendant argues that the trial court erred in awarding any damages to the plaintiffs. In support of this argument, it points to the trial court's own *132 skepticism about Mr. Downs' injuries as expressed in its written opinion.

Law
General damages involve mental or physical pain or suffering, inconvenience, loss of intellectual gratification or physical enjoyment or other losses of life or lifestyle which cannot be definitively measured in monetary terms. Fox v. Layton, 42,491 (La.App.2d Cir.10/17/07), 968 So.2d 302. The determination of the appropriate amount of damages is a factual determination entitled to great deference on review. Williams v. Enriquez, 41,200 (La.App.2d Cir.6/28/06), 935 So.2d 269. An appellate court should rarely disturb an award for general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Fox v. Layton, supra.
Awards for lost income are speculative and cannot be calculated with absolute certainty. The trier of fact is accorded broad discretion in assessing such damages, but there must be a factual basis in the record for the award. Brandao v. Wal-Mart Stores, Inc., 35,368 (La. App.2d Cir.12/19/01), 803 So.2d 1039, writ denied, XXXX-XXXX (La.4/26/02), 814 So.2d 558.
A claimant's recovery of medical expenses must be confined to those expenses related to the accident. In order to recover, the plaintiff must prove that, more probably than not, the medical treatment was necessitated by trauma suffered in the accident. Bassett v. Toys "R" Us Delaware, Inc., 36,434 (La.App.2d Cir.12/30/02), 836 So.2d 465, writ denied, XXXX-XXXX (La.4/25/03), 842 So.2d 408. A tortfeasor is required to pay for the cost of medical treatment, including overtreatment and unnecessary treatment, unless the overtreatment was incurred in bad faith. Williams v. Enriquez, supra.

Discussion
For pain and suffering, the trial court awarded Mr. Downs $200 in general damages. The award acknowledges Mr. Downs' injury, but it is sufficiently low to reflect the minor nature of the injury and its short duration. We find no manifest error by the trial court in making this award.
As to the lost wages, the trial court made an award of $250. Given the testimony of Mr. Downs' employer that he was paid $12.50 per hour as a painter, this equated to lost wages for only two and a half days. In his November 2, 2005 emergency room records, there is a notation that Mr. Downs was released to return to work on November 5, 2005. However, Mr. Downs' employer testified that he missed work for at least two weeks after the accident. In view of the minimal nature of the injuries and the trial court's finding that Mr. Downs missed work due more to choice than to cause, it appears that the trial court reasonably calculated this award to reflect only the brief period of time that the emergency room doctor directed Mr. Downs to refrain from working.
The trial court awarded $1,860.98 for medical expenses. Mr. Downs' medical bills included taking x-rays of his legs at least twice to determine whether there were any fractures, treating him for pain, and testing for such complications as deep vein thrombosis. Mr. Downs went to the emergency room on November 2, 2005, two days after the accident on Halloween 2005. Thereafter, he was seen on November 7 and 10, 2005, by two different physicians. While we agree with the trial court that the award is on the high side, there is no evidence establishing that the plaintiff sought any of this treatment in bad faith. *133 Again, we find no error on the part of the trial court.

CONCLUSION
The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant/defendant, E.O.M. Entertainment, Inc.
AFFIRMED.
NOTES
[1] Each year E.O.M. has three exhibits or haunted houses. In 2005, they were the Castle, the Insane Asylum, and the Manor of Horror. Each exhibit exists for three years before being changed to maintain public interest. Halloween 2005 was the last night of the third year for the Castle and the last time the coffin chute slide was used.
[2] There is some confusion as to this woman in the testimony of the Downs couple. Mr. Downs referred to the woman who operated the slide as "Ms. Diane." Mrs. Downs first mentioned a woman who operated the slide and then another woman being present. Mrs. Downs noted in her testimony that the E.O.M. employees were dressed up which made it difficult to tell what they looked like.
[3] The civil impossibility doctrine is rooted in La. C.C. Art. 1873, which deals with impossibility of performance of a contract. For a discussion of the application of the criminal "impossibility doctrine," see State v. Hollis, 96-738 (La.App. 5th Cir.1/28/97), 688 So.2d 108.